J-A27043-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAQUAN TYRONE ALLEN | : | |
| | : | |
| Appellant | : | No. 3137 EDA 2024 |

Appeal from the Judgment of Sentence Entered September 19, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0001075-2024

BEFORE:  BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED FEBRUARY 3, 2026**

Daquan Tyrone Allen ("Allen") appeals from the judgment of sentence entered by the Montgomery County Court of Common Pleas ("trial court") following his convictions of second-degree murder, robbery, and conspiracy.[1] Allen challenges the denial of his motion to suppress evidence, evidentiary rulings made by the trial court regarding expert witnesses, and the constitutionality of a sentence of life imprisonment without parole ("LWOP") for individuals convicted of second-degree murder.  We affirm.

**Facts and Procedural History**

The Commonwealth jointly tried Allen, Jerry Butler ("Butler"), and Damon Brantley ("Brantley") for their roles in the murder of William Carter

_____

[1] 18 Pa.C.S. §§ 2502(b); 3701; and 903.

("the victim"). A fourth defendant, Justin Davis ("Davis"), was sixteen at the time of the shooting and testified against his three co-conspirators. The trial court summarized the basic facts as follows:

> The conspiracy was set in motion by Katherine Emel ("Emel"). Emel had seen the victim with of [sic] money earlier that day, and told Allen that the victim owed her money. Allen, Butler, and Justin Davis drove to the victim's location, supplied by Emel, in a stolen Toyota Rav4. They parked behind the victim's Buick LaSabre, and when the victim went to his car, they got out of their car, robbed and shot the victim once in the head. They fled the scene, abandoned the Rav4 near the crime scene, and switched to a different car, an[] Infinity, to avoid detection. Later, Brantley went back to set fire to the Rav4. Allen, Butler, and Brantley fled to a residence in Endicott, New York, where they were apprehended on January 31, 2024.

Trial Court Opinion, 1/27/2025, at 1-2.

The jury convicted Allen of all three charges and the trial court imposed the mandatory sentence of LWOP. Allen filed a timely post-sentence motion for relief, and a timely notice of appeal following its denial. Allen thereafter complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and the trial court issued an opinion in response. He raises four claims for our review:

> 1. The trial court erred in admitting evidence seized pursuant to arrest and search warrants, executed in New York State, that did not meet the necessary standards for establishing the reliability of [c]onfidential [i]nformants under applicable New York law.
>
> 2. The trial court erred in not permitting defense counsel to voir dire Commonwealth expert Mark Minzola on the subject of timing advance records. Proper voir dire would have revealed that the witness did not have the necessary expertise to offer testimony regarding that portion of the records, resulting in a legally justified motion to exclude the timing advance data from the trial.

3. The trial court erred in denying [d]efense's request for a … hearing on the subject DNA evidence offered by the Commonwealth. The [d]efense offered a qualified expert who disputed the efficacy of the Commonwealth's computer program in light of the small quantity of the DNA and the complexity of the profile mixtures.

4. The trial court erred in sentencing … Allen to life imprisonment without the opportunity for parole. Given an analysis of the relevant law, history, and policy issues, [l]ife without parole for someone convicted as a nonshooter in a second-degree murder is a cruel punishment under the Pennsylvania Constitution.

Allen's Brief at 4-5.

## Suppression

Allen's first issue challenges the trial court's denial of his motion to suppress the discovery of Allen and his two codefendants following the execution of a search warrant at the home of Cassandra Lawson in Endicott, New York.

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pretrial motion to suppress.

*Commonwealth v. Carey,* 249 A.3d 1217, 1223 (Pa. Super. 2021) (citation omitted).

The affidavit was prepared by New York Warrant Control Officer Kevin Griffiths based on information supplied by Montgomery County Detective Heather Long via the United States Marshal's Office. *See* Application for Search Warrant, 1/31/2024, at unnumbered 1. The affiant stated that a confidential informant told Detective Long that Allen, Brantley, and Butler were staying at Lawson's residence. *Id.* The CI told Detective Long that, while the CI and Lawson were on a FaceTime call, the CI heard male voices and saw one black male in the background. *Id.* The CI asked Lawson who was present, and Lawson replied it was "her friend 'BJ' and his two friends." *Id.* The affiant stated that Montgomery County law enforcement knew "BJ" to be an alias for Butler, and the CI positively identified a picture of Butler as "BJ." *Id.* The CI further stated that the CI visited Lawson's home to watch her children and saw Butler, Brantley, and Allen. Additionally, the CI described Lawson's bedroom and the layout of her apartment. *Id.* at unnumbered 2. The affiant stated he "had a previous experience investigating a warrant in the residence" and confirmed the accuracy of the CI's description. *Id.*

Allen argues that the affidavit failed to establish probable cause because the affidavit failed to establish the informant's reliability. Examining whether

an affidavit based on information from confidential informants establishes probable cause involves two basic approaches. The first, established by the United States Supreme Court in *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969), sets forth a two-pronged test requiring proof of (1) the informant's veracity and (2) the basis for the informant's knowledge. *See generally Illinois v. Gates*, 462 U.S. 213, 239-40 (1983). The *Gates* Court "abandon[ed] the 'two-pronged test' established by [its] decisions in *Aguilar* and *Spinelli*" in favor of the "totality-of-the-circumstances analysis that traditionally has informed probable cause determinations." *Id.* at 238. Under Article I, Section 8 of our Constitution, we apply the *Gates* test to determine whether an affidavit based on information from a confidential informant established probable cause. *See Commonwealth v. Gray*, 503 A.2d 921, 922 (Pa. 1985).

New York, however, rejects the *Gates* test on the grounds it fails to "provide[] a sufficient measure of protection ... as a matter of State constitutional law," and thus continues to apply *Aguilar*/*Spinelli*. *See People v. Griminger*, 524 N.E.2d 409, 410 (N.Y. 1988). Thus, under New York law, "the application for a search warrant must demonstrate to the issuing Magistrate (i) the veracity or reliability of the source of the information, and (ii) the basis of the informant's knowledge[.]" *Id.* (citations omitted).

The initial question is whether New York or Pennsylvania law applies. "[W]e have adopted a flexible choice of law rule which weighs the interests

our sister-states may have in the transaction." ***Commonwealth v. Eichinger***, 915 A.2d 1122, 1133 (Pa. 2007) (citation omitted). The Commonwealth initially contended that Pennsylvania law should apply[2] but has abandoned that position on appeal. ***See*** Commonwealth's Brief at 14-15 (agreeing that New York law should control). For purposes of our disposition we accept, without deciding, that New York law applies.

Allen's argument in support of reversal states in full:

> In this case, the warrant did not present any information that established the reliability of the informant. The warrant did not contain any language indicating that the confidential informant was known to the [p]olice officer, or that he had provided reliable information to the [p]olice in the past. It merely announces the allegations that the informant made against the codefendants without external support. This is sufficient for an identified citizen informant, but for a [c]onfidential [i]nformant, the burden is higher.

> The information presented in the warrant, such as seeing one of the defendants on a [F]ace[T]ime call, describing the interior of the target dwelling, and identifying the defendants in photographs, is certainly relevant to this analysis, but it goes to the "basis of knowledge" leg of the ***Aguilar/Spinelli*** test, rather than the "reliability of the informant" leg. There is no language in the warrant that establishes the reliability of the [c]onfidential [i]nformant. As such, the warrant is deficient, and the evidence seized as the fruit of that warrant, i.e. the presence of all three codefendants in the same out-of-state dwelling, should have been suppressed.

_____

[2] The Commonwealth argued at the suppression hearing that Pennsylvania law should control, as "all of the individuals involved in this case are from Pennsylvania, the murder victim, three codefendants. The crimes occurred here in Montgomery County. And the consequences of interest are more pronounced in Pennsylvania than New York." N.T., 6/18/2024, at 46-47.

Allen's Brief at 21-22.

The trial court responded to this argument in its written opinion as follows:

> In this case, the CI provided law enforcement that she saw BJ in the FaceTime call with Lawson, and law enforcement knew that BJ was Butler's nickname. Additionally, the CI was able to positively identify a photograph of Butler as the individual the CI saw on the FaceTime call. Additionally[,] the CI was at the [New York] apartment and saw three males that the CI was later able to positively able to identify as Allen, Butler, and Brantley. Further[,] New York law enforcement was able to identify Butler as the male on the back patio of the residence, based on a photograph provided to law enforcement of Butler. Further, the CI was able to accurately describe details of the apartment where Lawson lived that law enforcement knew to be accurate given past interactions at that apartment provided an adequate indicia of reliability.

Trial Court Opinion, 1/27/2025, at 15-16.

We agree with the trial court's analysis. The veracity/reliability component "relates to the validity of the information and requires a showing either that the informant is credible and that the information supplied may, for that reason, be accepted as true or, in the absence of such showing, that the specific information given is reliable[.]" *People v. DiFalco*, 610 N.E.2d 352, 354 (N.Y. 1993). The *DiFalco* court explained the purpose served by requiring proof of veracity:

> [T]he protection provided by the veracity component is the assurance that the informant is worthy of belief or that the information is reliable. Part of this assurance, of course, necessarily depends on an evaluation of the behavior and manner of the informant and the plausibility of his statement. But the principal assurance is furnished by corroboration of the statement through a factor *independent of the statement's contents*--i.e., the conclusion by the police from their own separate investigation

that significant details of the information provided have been verified as accurate. The theory is that if significant details have been verified as true it is reasonable to suppose that other details, which remain unverified, are also true.

*Id.* at 355 (emphasis in original). The court held "that the veracity prong of the *Aguilar*/*Spinelli* test may, in a proper case, be established through corroboration where the police have verified only noncriminal details of activity referred to in the informant's statement." *Id.*

We note that the reference to "other details" that remain unverified typically refers to criminal activity, such as a tip that a target is selling drugs. But here, the only relevant "details" concerned the physical presence of the three codefendants, which is noncriminal in nature. Thus, apart from maintaining constant visual surveillance to see if Allen, Brantley, and/or Butler entered or exited the dwelling—which Allen does not suggest was required—the authorities corroborated the few other details that could be corroborated. The first of these was the CI's description of the apartment's layout. The affiant was able to confirm this detail, and it lent credibility to the CI's claim to know Lawson personally and thus to the CI's claims that the three codefendants were present at Lawson's dwelling. Second, the CI was able to identify Butler in a photograph, referring to him by his nickname known by the Montgomery County police, based upon seeing Butler during a recent videocall the CI had with Lawson. Again, confirmation of this detail by police lent credibility to the CI's claim that the three codefendants were in Lawson's home.

Furthermore, while the CI was not identified by name, the affidavit establishes that the CI provided information in a face-to-face meeting and was thus known to police. *Compare Gates*, 462 U.S. at 225 (discussing tip supplied by anonymous letter sent to police station). Of course, the fact that the Pennsylvania authorities deemed the informant credible is beside the point as "[i]t is the issuing [j]udge, not the police or applicant for the search warrant, who must be satisfied that there is a reasonable basis for the issuance of the warrant[.]" *People v. Martinez*, 607 N.E.2d 775, 777 (N.Y. 1992). Nonetheless, the fact that the informant was known to police, combined with the corroboration of Lawson's apartment and identification of Butler in a photograph by his nickname known to police, as set forth in the affidavit, provided a sufficient basis for the issuing authority to credit that the informant was reliable. No relief is due.

## Voir Dire

In his second issue, Allen challenges the trial court's purported denial of his request to voir dire Detective Mark Minzola concerning "timing advance records." Allen's Brief at 22. These records constitute "location data created and maintained by cell carriers in the normal course of their business." *Id.*

The record reflects that at the beginning of the third day of trial, Allen raised a claim asserting that "the cell phone records are records that require expert interpretation." N.T., 9/13/2024, at 8. He conceded that "they are a business record" but argued that their relevance turns on "the extra expertise

of a witness who's aware of the contents and what they mean." *Id.* Specifically, Allen stated he intended to "voir-dir[e] Detective Minzola on his expertise as to a specific part of the records called timing advance[.]" *Id.* Allen stated that, depending on the results of that voir dire, he would "potentially request exclusion of that portion of … the phone records based on the fact that they could not be interpreted properly." *Id.*

Allen then referenced *Commonwealth v. Vance*, 316 A.3d 183, 190 (Pa. Super. 2024), *appeal granted in part*, 332 A.3d 1182 (Pa. 2025), describing the case as "almost entirely on all fours with this issue" and stated his assumption that the trial court would "deny [his] request" since the trial judge in this matter had also presided over the *Vance* case. N.T., 9/13/2024, at 8-9. The court referenced an earlier agreement that Detective Minzola would only testify to phones "being generally in the area." *Id.* at 9. The court then discussed *Vance*:

> [In *Vance*], they were talking about – the defense was objecting to the Google GPS location information, and the Court affirmed my decision, and I'm quoting from [p]age [nine]:
>
> > In explaining its reason for overruling [the] objection to Lieutenant Mitchell's expert testimony, the [t]rial [c]ourt applied Rule 703, observed that Lieutenant Mitchell was qualified as an expert in historical call detail analysis. The Google GPS location records are records ordinarily relied upon by similar experts and he was made aware of this information when it was provided by Google. Our review confirms that in conformance with Rule 703, Lieutenant Mitchell prepared his expert report and testimony based on data which Google made him aware of which is regularly relied on by similar experts.

- 10 -

> So I'm allowing counsel, of course, to research that further. And if you come up with anything more specific, we'll address it. Okay?

*Id.* at 9-10. Allen then replied, "Understood." *Id.* at 10.

Later that day, the Commonwealth called Detective Minzola. Before moving to qualify him as an expert, the Commonwealth elicited details of his experience and education. Among other topics, the Commonwealth asked, "And do you have any experience and/or training concerning timing advance records and analysis?" *Id.* at 175. Detective Minzola confirmed that he did. Shortly thereafter, the Commonwealth "offer[ed] Detective Minzola as an expert in the field of historical cellular telephone records analysis." *Id.* at 178. The trial court did not orally respond, but the attorneys for all three defendants replied. Counsel for Allen stated, "Reserving my prior objection, I'll take no position." *Id.*

Turning to the substantive testimony, Detective Minzola offered the following basic description of timing advance records:

> So what happens with timing advance, this is not a user-based record like your call detail record. This is an engineering record meaning you don't have to do anything with your phone other than it being powered on and you're connected to your network. And they do this to improve their system or whatnot. But what happens is a signal is sent from a tower, a cell site. And it's a time measurement of how long that signal goes from the cell tower to your phone and your phone to return that signal. Now, with that, they can come up with an approximate distance from that tower. …. It could be multiple blocks, ten to twenty blocks.
>
> Timing advance will get you a little bit closer to a general location. So timing advance records are very helpful to us in determining general location.

- 11 -

*Id.* at 189.

Allen submits that, if he had been permitted to voir dire Detective Minzola, he would have been able "to determine whether or not the [d]etective had knowledge, personally or as an expert, of how this data is created." Allen's Brief at 22-23. "If he did not have sufficient knowledge, the intent – as stated on the record – was to move for the exclusion of the timing advance records." *Id.* at 23. Furthermore, while not outright conceding that the underlying records were properly admitted as business records, Allen agrees that such records "kept in the ordinary course of business … are admissible at trial." *Id.* However, Allen submits this is not a typical business record as "there is information contained within [t]he business record that … requires specific expertise in interpretation." *Id.*

Finally, Allen notes that our Supreme Court granted allowance of appeal in *Vance* on the following two issues:

> (1) Whether Google GPS location data was improperly admitted into evidence without proper authentication, as the Commonwealth presented no testimony establishing the reliability and accuracy of the information generated by Google?

> (2) Whether a police lieutenant who lacked information regarding Google's proprietary algorithms and processes was erroneously permitted to testify as an expert regarding Google's GPS location data?

*Vance*, 332 A.3d 1182 (per curiam). Allen states "[t]hese are precisely the two issues that defense was planning to raise and preserve through voir dire." Allen's Brief at 27.

- 12 -

Allen seemingly concedes that this Court's decision in **Vance** is dispositive, as he argues that the trial court's ruling precluded him from "rais[ing] and preserv[ing]" the issues on which the Supreme Court granted review. **Id.** In fact, beyond citing **Vance**, the only case Allen cites in support is **Commonwealth v. DiGiacomo**, 345 A.2d 605 (Pa. 1975).[3]

On this note, the Commonwealth argues that Allen has waived his claim. "The trial court provided counsel … with the opportunity to cross-examine Detective Minzola about his qualifications as an expert or to object to the trial court deeming him qualified to testify as an expert, but he chose not to do so." Commonwealth's Brief at 22-23. He therefore "failed to preserve for appeal any claim regarding the trial court's determination that Detective Minzola was qualified to testify as an expert or the admissibility of his expert testimony." **Id.** at 23.

_____

[3] In that case, DiGiacomo admitted that he shot and killed the victim but claimed that he did so to protect his friend, John Hruska, from serious bodily injury. **Id.** at 606. DiGiacomo attempted to introduce, through a custodian of records, hospital records to prove the fact of Hruska's injuries. Our Supreme Court held that the records were not admissible to establish "the admitting diagnosis of the injuries sustained," as that would constitute medical opinion. **Id.** at 608. "Such testimony is in the nature of expert opinion testimony and accordingly was properly excluded." **Id.**

Allen argues that the same logic applies here. We disagree. The **DiGiacomo** Court holds that a custodian of records may not introduce records that are **themselves** tantamount to expert opinion. Here, the timing advance records, standing alone, do not constitute any kind of opinion. Detective Minzola, applying his expertise to the content of that data, offered an opinion based, in part, on those records.

- 13 -

We agree that Allen has waived his claim. His assertion that the trial court precluded him from asking questions of Detective Minzola on voir dire is belied by the record. The trial court certainly expressed its view that the ultimate question of the admissibility of the detective's opinion was governed by *Vance*. However, the court did not preclude Allen from cross-examining Detective Minzola on his specific knowledge of how phone companies generated these records. The court simply indicated that, regardless of whether Detective Minzola knew how the phone company generated the records, he was entitled to offer an opinion based on the records supplied. Nothing in the above-quoted exchange establishes that the court barred Allen from pursuing the claims he now raises relative to Detective Minzola's qualifications. Furthermore, when the Commonwealth moved to qualify the detective as an expert, the trial court made no comment, and Allen chose not to ask any questions.

There is some merit to a finding that any voir dire would be irrelevant since, under *Vance*, Detective Minzola was entitled to offer an expert opinion regardless of whether he was familiar with how the underlying data was created. As established by Allen's own appellate argument, however, it remains unknown whether Detective Minzola had knowledge of the underlying processes. His claim is entirely conditional in nature: "**If** [Detective Minzola] did not have sufficient knowledge, the intent – as stated on the record – was to move for the exclusion of the timing advance records." Allen's Brief at 23

(emphasis added). This stands in contrast to the claim in **Vance**, where the appellant argued that the Commonwealth, as the proponent, was required to establish that the expert did have such knowledge. **See Vance**, 316 A.3d at 194 ("[Vance] attempts to impose additional criteria for its admissibility, namely, that Lieutenant Mitchell knows how Google's GPS location information is obtained, stored and/or verified for accuracy and something about Google's proprietary information.") (quotation marks omitted). Thus, while Allen claims the trial court's ruling precluded him from raising "a legally-founded motion to exclude," Allen's Brief at 24, he could have alleged that the Commonwealth needed to establish that Detective Minzola possessed the required expertise to either qualify as an expert and/or offer an expert opinion. He did not raise this claim below, nor does he advance it on appeal.

Because the trial court did not impose any limitation on Allen's ability to examine Detective Minzola as to his knowledge in that regard, and because Allen ties his appellate argument to whether Detective Minzola had that knowledge, we conclude that Allen waived his claim.[4]

---

[4] We add that while Allen states that he "intended" to preserve the same two issues on which our Supreme Court granted review in **Vance**, he does not explain why he needed to voir dire Detective Minzola to raise objections to the reliability and authenticity of the records. Our Supreme Court granted allowance of appeal on the question of whether "Google GPS location data was improperly admitted into evidence without proper authentication, as the Commonwealth presented no testimony establishing the reliability and accuracy of the information generated by Google[.]" **Vance**, 332 A.3d 1182. Allen could have raised the same reliability and accuracy concerns regardless

*(Footnote Continued Next Page)*

### *Frye* Hearing

Allen's third claim addresses the trial court's denial of his request to hold a *Frye*[5] hearing on the admissibility of the expert testimony linking codefendant Butler's DNA to the victim.

We review evidentiary decisions, including whether the trial court erred in not granting a *Frye* hearing, for an abuse of discretion. *Commonwealth v. Jacoby*, 170 A.3d 1065, 1090 (Pa. 2017). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Id.* (quoting *Commonwealth v. Walker*, 92 A.3d 766, 772 (Pa. 2014).

Our Rules of Evidence permit admission of expert testimony if "the expert's methodology is generally accepted in the relevant field." Pa.R.E. 702(c). This "general acceptance" rule is based on the standard set forth by *Frye*.

The *Frye* test is a two-step process. First, the party opposing the evidence must show that the scientific evidence is "novel" by demonstrating "that there is a legitimate dispute regarding the reliability of the expert's

___

of whether Detective Minzola knew exactly how the phone company generated the underlying data.

[5] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

conclusions." If the moving party has identified novel scientific evidence, then the proponent of the scientific evidence must show that "the expert's methodology has general acceptance in the relevant scientific community" despite the legitimate dispute. **Commonwealth v. Foley**, 38 A.3d 882, 888 (Pa. Super. 2012) (citations omitted). "This Court has explained that scientific evidence is 'novel' when 'there is a legitimate dispute regarding the reliability of the expert's conclusions.'" **Commonwealth v. Cramer**, 195 A.3d 594, 606 (Pa. Super. 2018) (quoting **Commonwealth v. Safka**, 95 A.3d 304, 307 (Pa. Super. 2014)). For **Frye** to apply, the dispute as to "the reliability of an expert's conclusions" pertains to the methodology used to reach that conclusion, not to the conclusion itself. **Grady v. Frito-Lay**, 839 A.2d 1038, 1047 (Pa. 2003).

At trial, the Commonwealth called Thomas Rataic, a forensic DNA scientist employed by the Pennsylvania State Forensic DNA Lab. N.T., 9/12/2024, at 300. Rataic discussed "STR or short tandem repeat analysis," which "allows us to isolate specific regions of the DNA molecule where short sequences [are] known to rerepeat." *Id.* at 304. These repeating regions "vary in length from one person to another" and thus can differentiate individuals. *Id.*

Rataic tested several items to determine if DNA from the defendants was present. He explained that some of the items were discarded as unusable "due to complexity of mixtures." *Id.* at 310. According to Rataic, if the

"mixture profile is over four people ... it's automatically uninterpretable" per lab policy. *Id.* at 311. He stated that prior to 2020, his lab would "only interpret it … if there was a single major [contributor]" to the profile. *Id.* He explained that in 2020, however, his lab "brought online a probabilistic genotyping system called STRmix which allows us to use more information that is in the profile than we could on our own." *Id.* at 312. With that system, the lab "can interpret a four-person mixture basically no matter what." *Id.*

Turning to the items linking Butler to the victim, Rataic obtained "a DNA profile consistent with a mixture of four contributors" from an item designated as item Q9, described as the victim's "pants front right pocket interior[.]" *Id.* at 314. Rataic testified that Butler "can be included as a potential contributor to this mixture profile." *Id.* He calculated that the profile was "520,000 times more likely" to have originated from a mixture of the victim, Butler, and two unknown, unrelated individuals than if it had originated from a mixture of the victim and three unknown, unrelated individuals. *Id.* at 314-15.[6]

Next, Rataic testified that "a DNA profile consistent with the mixture of four contributors was obtained from the pants front left pocket interior" of the

_____

[6] We note that the notes of testimony use the word "related" not "unrelated" pertaining to Rataic's testimony solely as to Q9. ***See generally*** N.T., 9/12/2024, at 314-19. As it is incongruous that Rataic would have used such a vastly different comparison group for only one of the three DNA samples tested, we logically conclude that this was either a typo or an unintentional misstatement, and Rataic instead intended to testify that the comparison group for Q9 was also as to "unrelated individuals." *Id.*

victim, designated as item Q11. *Id.* at 318. Again, Butler was included as a potential contributor. For this item, the "profile obtained from this item is 71 quadrillion times more likely if it originated from … the victim … Butler … and two unknown unrelated individuals than if it had originated from … the victim … and three other unknown unrelated individuals in the population." *Id.*

Finally, he testified that "a DNA profile consistent with a mixture of four contributors was obtained from the sweatshirt front pouch pocket interior," designated as item Q12. *Id.* at 319. Butler was again "included as a potential contributor" to the mixture. *Id.* The "profile obtained from this item is 140 million times more likely" than a profile originating from the victim and three other unknown and unrelated individuals. *Id.*

During pretrial discovery the Commonwealth declared its intent to offer expert testimony in line with the foregoing summary. Codefendant Butler filed a motion seeking a *Frye* hearing, in which Allen joined. Butler's motion stated that "the reliability of probabilistic genotype software like STRmix may be validated for simpler DNA mixtures involving less than three … contributors," but argued that the "reliability … for analyzing more complex mixtures"—defined as those involving "four contributors" or where "the minor contributor contributes less than 20% of the DNA"—has not been established. Motion in Limine, 9/6/2024, at ¶ 22. Butler cited in support a 2016 report by the President's Council of Advisors on Science and Technology ("PCAST"). *Id.*

Additionally, Butler retained expert witness Katherine Cross, who reviewed the discovery and "opined that the conclusions … cannot be deemed reliable based, in part, on the lack of available studies to establish the reliability of STRmix method" for situations where "there are three … or more contributors … and where the minor contributor of interest has a contribution of less than 20%." *Id.* ¶ 25. The motion attached Cross' report and quoted her conclusion:

> The assigned percentage of contribution for … Butler in these samples is low. The statistical reports generated in the laboratory samples is low. The statistical reports generated in the laboratory notes allocate percent contributions for each individual in the mixture. For Q9, Mr. Butler is assessed at 6% contribution. For Q11, Mr. Butler is assessed at 8% contribution. For Q12, Mr. Butler is assessed at 4%. These percentages are unreliable in three[-]person (and higher) mixtures. The samples Q9, Q11, and Q12 do not meet the 20% of the sample or the minimum level of template required for the method. The total template of all contributors exceeds the minimum as does the amount for … [the victim]'s contribution, but the minor contributors do not. Laboratories have policies regarding interpretation of three (or more) person mixtures. Many laboratories will not interpret three or more person mixtures, with the exception of a clear major contributor. The clear major contributor can be resolved, but any minor contributors are listed as inconclusive or even excluded, depending on the alleles detected.

*Id.* at ¶ 26.

The trial court held a hearing on the motion, at which the parties "agreed that the defense can proceed on Ms. Cross' letter of opinion dated September 6, 2024, and an e-mail she sent, which is sort of like a supplement to that opinion, on September 9, 2024." N.T., 9/10/2024, at 12. Butler stated that the defendants' joint argument "is very limited. We're not saying that STRmix

is not reliable in all circumstances." *Id.* at 13. Instead, Butler argued that "STRmix has not been proven to be reliable … when you have multiple confounding factors that complicate the DNA sample. And those, in this case, are the number of contributors." *Id.* at 13-14. The parties also cited the fact that Butler's DNA was present at low levels, as his percentage contribution on two of the items was eight and six percent, and "even less" on the remaining item. *Id.* at 14. Additionally, Butler argued "there's significant overlap in the alleles of the victim in this case, who is presumed to be the primary contributor to the DNA samples that were recovered from his clothing, because that's what we're talking about here." *Id.;* Motion in Limine, 9/6/2024, Exhibit D at 1 (Cross' report). As asserted by Butler, these "multiple confounding factors" established the novelty of STRmix. N.T., 9/10/2024, at 18.

Following Butler's argument, Allen added: "I think that we are presented now with this sort of bizarre *Frye* situation where much of what was done is commonly accepted, but we have a new scenario that, based on relatively recent research, may not be considered reliable." *Id.*

The Commonwealth presented its counterargument, which the court accurately summarized in its written opinion supporting its denial of a *Frye* hearing:

> The Commonwealth explained that the STRmix software had been used since 2012, and a total of 114 labs use this software throughout the world, including 91 labs in North America, including the FBI, the Department of Alcohol, Tobacco, Firearms, and Explosives. The Commonwealth suggested that the issues that defense counsel has raised go to the weight of that evidence.

The Commonwealth addressed that 2016 study, relied on by the defense expert to opine that the use of STRmix technology with multiple contributors was unreliable. The Commonwealth noted that the 2016 study was limited and that it did not conclude the use of STRmix for a complex DNA sample was unreliable; rather, it concluded that future testing was warranted. Additionally, the Commonwealth noted an article published in 2017 as a response to the 2016 study entitled, Internal Validation of STRmix- a Multi Laboratory Response to PCAST. This 2017 article set out the limitations of the 2016 study, and the 2017 article reported on a more robust study of the STRmix technology in complex DNA samples, and concluded that "the material provided demonstrate a foundational validity of STRmix for complex mixed DNA profile to levels well beyond the complexity and contribution levels suggested by PCAST." The Commonwealth further [c]ited to another study published by the FBI in its peer review literature entitled, Internal Validation of STRmix of the Interpretation of Single Source and Mixed DNA Profiles. The Commonwealth highlighted the conclusion of the FBI study, that the findings support that STRmix is sufficiently robust for implementation in forensic laboratories based upon complex testing of over 300 samples, including ranges from one to five contributors.

Trial Court Opinion, 1/27/2025, at 24-25 (citations omitted).

Following its review, the trial court concluded "that the defense had not satisfied the threshold **Frye** requirement that the methodology being challenged was novel." **Id.** at 26.

Allen has failed to persuade this Court that the trial court abused its discretion in so ruling. Allen effectively presented a battle of the experts, and the trial court concluded that the arguments presented "a question of weight and not admissibility." **Id.** Cross' expert report cited a study suggesting that STRmix produced unreliable results when more than three contributors are present in a sample and where the relevant DNA contribution level is low.

- 22 -

Conversely, the Commonwealth argued, and the trial court accepted, that the sole study referenced by Cross had been addressed and debunked a year later. Furthermore, an FBI study concluded "that STRmix is sufficiently robust … based upon complex testing of over 300 samples, including ranges from one to five contributors." *Id.* at 25.

We further find compelling our Supreme Court's decision in *Jacoby*, a case involving a different type of DNA testing. The Commonwealth's expert there used Y-STR DNA, which involves STR sequencing focused on the Y chromosome. *See generally Jacoby*, 170 A.3d 1065 at 1091. The Commonwealth obtained scrapings from underneath the murder victim's fingernails and submitted those items for Y-STR DNA testing. "A sample from [the victim]'s left hand produced a full Y–STR profile from a single contributor. Further testing revealed that Jacoby and all of his male relatives could not be excluded as the source of the sample." *Id.* at 1073.

Jacoby requested a *Frye* hearing, arguing that Y-STR is weaker than other types of testing "because instead of making a match, the result can merely indicate that Jacoby and all his male relatives cannot be ruled out." *Id.* (citation and quotation marks omitted). The Court concluded that Jacoby failed to establish an abuse of discretion:

> Questions that raise scientifically complex questions are no easy task for courts. Nonetheless, when considering those questions, we remain bound by our standard of review. Thus, Jacoby is entitled to relief only if he can demonstrate to this Court that the trial court's decision was an abuse of discretion; that is, inter alia, the court's determination was manifestly unreasonable.

Under the limited circumstances of this case, we conclude that Jacoby did not make such a showing.

Jacoby could not overcome the trial court's conclusion that his argument was predicated upon the weight that should be assigned to the Y–STR DNA evidence, and not upon the novelty of the database process itself. Repeatedly, Jacoby was forced by the trial court's questioning to concede that the Y–STR databases were not created in a novel fashion that would differentiate the scientific methods of creating these databases from others. Indeed, Jacoby's attorney conceded that the technique for creating the database was the same as in other DNA databases. Jacoby's arguments were premised substantially upon the fact that Y–STR databases have not yet grown large enough to secure a more reliable result, that they do not account for geographical differences, and that, because of their size and limitations, the results are not sufficiently discriminatory to constitute reliable evidence. These arguments are directed at the weight that should be assigned to that evidence at trial, and not at the novelty of the creation of the databases. They are arguments for a jury.

*Id.* at 1094–95 (footnotes and citations omitted).

We likewise conclude that, under the circumstances of this case, Allen failed to make the required showing that the trial court abused its discretion. Allen and his codefendant appeared to agree that STRmix generally produces reliable results. *See* N.T., 9/10/2024, at 13 (Butler noting that their argument "is very limited" and that they do not "say[] that STRmix is not reliable in all circumstances."). Their claim was that the test results were unreliable in this particular case because of the combination of multiple variables—namely, the presence of four contributors, the low contribution percentage by Butler, and shared alleles between the victim and Butler.

Allen's argument rests, in large part, on the fact he presented an expert witness to establish the "novelty" of the testing under these circumstances.

- 24 -

*See* Allen's Brief at 29 ("There is no better way to establish and litigate an expert dispute than to call an expert, well-regarded in the field, who disputes the idea or practice in question[.]"). However, beyond citing one study, Allen's expert did not establish that scientists in the field view STRmix as unreliable under these circumstances.

In this posture, where Allen bore the burden of showing "novelty" under *Frye*, the trial court could not simply credit Cross' view to establish that point. In *Commonwealth v. Topa*, 369 A.2d 1277, 1282 (Pa. 1977), wherein our Supreme Court adopted *Frye*, the Commonwealth wished to present an expert to testify that Topa made a phone call based on "voiceprint evidence." *Id.* at 1279. The Court stressed it did "not question the sincerity of [the expert's] testimony" and "respect[ed] his considerable expertise." *Id.* at 1281. It concluded, however, that "his opinion, alone, will not suffice to permit the introduction of such scientific evidence into a court of law. Admissibility of the evidence depends upon the [g]eneral acceptance of its validity by those scientists active in the field to which the evidence belongs." *Id.*

Similarly, we do not and cannot question Cross' opinion or her considerable expertise. At the same time, neither the trial court nor this Court can simply credit one expert's view over another as to the reliability of STRmix in this case. "One of the primary reasons we embraced the *Frye* test in *Topa* was its assurance that judges would be guided by scientists when assessing the reliability of a scientific method." *Frito-Lay*, 839 A.2d at 1044-45. Thus,

when faced with competing expert opinions, neither the trial court nor this Court may simply select one of the two opinions. "[I]t is no part of the trial court's function to assess whether it considers those theories, techniques[,] and/or conclusions to be accurate or reliable based upon the available facts and data." *Walsh Est. of Walsh v. BASF Corp.*, 234 A.3d 446, 458 (Pa. 2020).

The correctness of the trial court's decision is further evidenced by the email treated as a supplement to Cross' report and entered at the hearing. Therein, Cross addressed the 2017 article noted by the Commonwealth, stating:

> I am very familiar with this article. It addresses multiple contributors, low contribution, and overlap, but not in combination. It also addresses false inclusions due to common alleles. Anything under 500,000 can be due to chance based on this article and the FBI Internal validations. I don't know of any published or validation studies that specifically look at stochastic effects due to low contribution + significant overlap with an assumed contributor (who is also the major contributor) + three or more contributors in the same sample. **I think this case presents a unique scenario that is not generally addressed in validation studies.** It is basically a "worst case scenario" of issues that can arise in mixture interpretation.

Exhibit C, 9/1/2024 (emphasis added).

In other words, Cross stated her opinion that STRmix produces an unreliable result in this specific circumstance. The *Frye* rule, however, "applies to an expert's methods, not his conclusions[.]" *Frito-Lay*, 839 A.2d at 1047; *see also Jacoby*, 170 A.3d at 1095 n.14 ("[T]he dissent points out that Jacoby highlighted differences between Y–STR DNA testing and

autosomal DNA testing. Once more, all of these arguments are arguments that can be made to a jury to demonstrate why Y–STR DNA results should not carry the same weight as other types of DNA testing."). Indeed, Cross presented a substantially similar conclusion when she served as the expert for Jacoby, which our Supreme Court found was properly presented to the jury, but not the basis for a *Frye* hearing. *See Jacoby*, 170 A.3d at 1095 n.15.

Allen was required to establish that the use of STRmix in this case was "novel." We find no error in the trial court's ruling that he failed to carry his burden of proof. No relief is due.

## Unconstitutionality of LWOP

Allen's fourth and final issue presents an argument that the sentence of LWOP is unconstitutional. In *Commonwealth v. Rivera*, 238 A.3d 482 (Pa. Super. 2020), we rejected the claim that the Eighth Amendment to the United States Constitution forbids a sentence of LWOP for second-degree murder. In *Commonwealth v. Zettlemoyer*, 454 A.2d 937, 967 (Pa. 1982), our Supreme Court held that our charter's provision against cruel punishment is coextensive with the Eighth Amendment to the United States Constitution.

In *Commonwealth v. Lee*, 301 A.3d 899 (Pa. Super. filed June 13, 2023) (non-precedential decision),[7] this Court concluded that *Rivera* remained good law and had not been undermined by subsequent United

_____

[7] We may cite non-precedential decisions of this Court filed after May 1, 2019, for persuasive value. *See* Pa.R.A.P. 126(a).

States Supreme Court caselaw. We also concluded that *Zettlemoyer* remained good law, and thus Lee's claim under our Constitution likewise failed.

Our Supreme Court granted Lee's petition for allowance of appeal on both questions. *See Commonwealth v. Lee*, 313 A.3d 452 (Pa. 2024). Allen notes that "[m]uch of" his argument "is derived from [Lee's b]rief in that case[.]" Allen's Brief at 31. We are persuaded by the *Lee* Court's conclusions that the *Rivera* and *Zettlemoyer* cases remain binding on this Court. Therefore, unless and until our Supreme Court overrules those precedents in *Lee*, Allen's claims on this issue fail.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/3/2026